# Exhibit A

**FIXED RATE NOTE – CLOSED END**
**(HOME EQUITY CONVERSION)**

We hereby certify that
this is a true & correct
copy of the original.

_____ Date 2/19/2014

STATE OF MA

October 21, 2011

PROPERTY ADDRESS

FHA Case Number:
Loan Number:
MIN Number:

    122 Oakmont Road
    YARMOUTH PORT, MA 02675
    BARNSTABLE COUNTY

1. **DEFINITIONS**
"Borrower" means each person signing at the end of this Note. "Lender" means MetLife Home Loans, a Division of MetLife Bank, N.A. and its successors and assigns. "Secretary" means the Secretary of Housing and Urban Development or his or her authorized representatives.

2. **BORROWER'S PROMISE TO PAY; INTEREST**
In return for amounts to be advanced by Lender up to a maximum principal amount of Seven Hundred Twelve Thousand Five Hundred and 00/100 Dollars (U.S. $712,500.00), to or for the benefit of Borrower under the terms of a Home Equity Conversion Loan Agreement dated October 21, 2011 ("Loan Agreement"), Borrower promises to pay to the order of Lender a principal amount equal to the sum of all Loan Advances made under the Loan Agreement with interest. All amounts advances by Lender, plus interest, if not paid earlier, are due and payable on February 28, 2093. Interest will be charged on unpaid principal at the rate of Five and 060/1000's percent (5.060%) per year until the full amount of principal has been paid. Accrued interest shall be added to the principal balance as a Loan Advance at the end of each month and shall likewise thereafter bear interest.

3. **PROMISE TO PAY SECURED**
Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called the "Security Instrument." That Security Instrument protects the Lender from losses which might result if Borrower defaults under this Note.

4. **MANNER OF PAYMENT**
    (A) **Time**
    Borrower shall pay all outstanding principal and accrued interest to Lender upon receipt of a notice by Lender requiring immediate payment in full, as provided in Paragraph 6 of this Note.

    (B) **Place**
    Payment shall be made at 334 Madison Avenue, Convent Station, NJ 07961 or at such other place as Lender may designate in writing by notice to Borrower.

    (C) **Limitation of Liability**
    Borrower shall have no personal liability for payment of this Note. Lender shall enforce the debt only through sale of the Property covered by the Security Instrument ("Property"). If the Note is assigned to the Secretary, the Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

5. **BORROWER'S RIGHT TO PREPAY**
A Borrower has the right to pay the debt evidenced by this Note, in whole or in part, without charge or penalty. Any amount of debt prepaid will first be applied to reduce the principal balance of the Second Note described in Paragraph 10 of this Note and then to reduce the principal balance of this Note.

All prepayments of the principal balance shall be applied by Lender as follows:

First, to that portion of the principal balance representing aggregate payments for mortgage insurance premiums;

Second, to that portion of the principal balance representing aggregate payments for servicing fees;

Third, to that portion of the principal balance representing accrued interest due under the Note; and

Fourth, to the remaining portion of the principal balance.

Prepayment amounts will not be made available to Borrower and prepayments will not increase the amount available to Borrower for Loan Advances.

6. **IMMEDIATE PAYMENT IN FULL**
    (A) **Death or Sale**
    Lender may require immediate payment in full of all outstanding principal and accrued interest if:

        (i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower, or

        (ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains (a) title to the Property in fee simple (b) a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower, or (c) a life estate in the Property (or retains a beneficial interest in a trust with such an interest in the Property).





1st Fixed Note (closed)

© Bay Docs, Inc. 06/10

NOTE

(B) Other Grounds
Lender may require immediate payment in full of all outstanding principal and accrued interest, upon approval by an authorized representative of the Secretary, if:

(i)  The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower;

(ii)  For a period of longer than twelve (12) consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

(iii)  An obligation of the Borrower under the Security Instrument is not performed.

(C) Payment of Costs and Expenses
If Lender has required immediate payment in full, as described above, the debt enforced through sale of the Property may include costs and expenses, including reasonable and customary attorney's fees associated with enforcement of this Note to the extent not prohibited by applicable law. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note.

(D) Trusts
Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interest in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph.

7. WAIVERS
Borrower waives the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

8. GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the Property Address above or at a different address if Borrower has given Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by first class mail to Lender at the address stated in Paragraph 4(B) or at a different address if Borrower is given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note only through sale of the Property.

10. RELATIONSHIP TO SECOND NOTE
(A) Second Note
Because Borrower will be required to repay amounts which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to grant a Second Note to the Secretary.

(B) Relationship of Secretary Payments to this Note
Payments made by the Secretary shall not be included in the debt due under this Note unless:

(i)  This Note is assigned to the Secretary; or

(ii)  The Secretary accepts reimbursements by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments made by the Secretary, including interest on the payments, shall be included in the debt.

(C) Effect on Borrower
Where there is no assignment or reimbursement as described in (B)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

(i)  Be required to pay amounts owed under this Note until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note held by the Secretary, notwithstanding anything to the contrary in Paragraph 6 of this Note; or

(ii)  Be obligated to pay interest or shared appreciation under this Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance of this Note, notwithstanding anything to the contrary in Paragraph 2 of this Note or any Allonge to this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_____          Oct 21, 11
Aurelius V Skapars (Borrower)                         Date

_____ Trustee   Oct 21, 11
Aurelius V Skapars, Trustee                          Date

_____ Trustee   Oct 21, 11
Yvonne V Skapars, Trustee                            Date

## ALLONGE

**Loan Number:** ▮▮▮▮▮▮▮

BORROWER(S): Aurelius V Skapars

        Yvonne V Skapars  Trustee
        Aurelius V Skapars  Trustee

ADDRESS: 122 Oakmont Road
        Yarmouth Port, MA 02675

AMOUNT: $712,500.00

Dated: 10/21/11

Pay to the order of

**Nationstar Mortgage LLC**

Without Recourse:
MetLife Home Loans,
a Division of MetLife Bank, N.A.

By: _____
Laura A. Wichman, Limited Vice President

# Allonge To Note

Loan Number:

Executed By:

Aurelius V Skapars

Property Address:    122 Oakmont Road
YARMOUTH PORT MA 02675

Pay To The Order Of:

Without Recourse
Nationstar Mortgage LLC

By:

Michael J Lima
Senior Vice President



Bk 2576  P991  #53720
10-27-2011 @ 09:13a



Record and Return to:
MetLife Home Loans, a Division of MetLife Bank, N.A.
P.O. Box 8157
Edmond, OK 73083-8157

*Mortgage Broker* is Rockland Trust Company.Mortgage Broker's post office address is 288 Union Street, Rockland, MA, 02370 and Mortgage Broker's license number is 401447

*Mortgage Loan Originator* is _____,Mortgage Loan Originator's post office address is _____, _____ and Mortgage Loan Originator's license number is ████████

# FIXED RATE HOME EQUITY CONVERSION MORTGAGE
## THIS MORTGAGE SECURES A REVERSE MORTGAGE LOAN

**COMMONWEALTH OF MASSACHUSETTS**            FHA Case Number: ████████████████
                                            Loan Number: ████████████

THIS MORTGAGE ("Security Instrument") is given on October 21, 2011. The mortgagor is Aurelius V. Skapars, Trustee and Yvonne V. Skapars, Trustee of the Skapars Nominee Trust whose address is 122 Oakmont Road, YARMOUTH PORT, MA 02675 ("Borrower"). This Security Instrument is given to MetLife Home Loans, a Division of MetLife Bank, N.A., which is organized and existing under the laws of the United States of America, and whose principal office address is 334 Madison Avenue, Convent Station, NJ 07961 ("Lender"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Note dated the same date as this Security Instrument ("Note"). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, including all future advances, with interest, and all renewals, extensions and modifications of the Note, up to a maximum principal amount of Seven Hundred Twelve Thousand Five Hundred and 00/100 Dollars (U.S.$712,500.00); (b) the payment of all other sums, with interest, advanced under Paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the perfor mance of Borrower's covenants and agreements under this Security Instrument and the Note. The full debt, including all amounts described in (a), (b), and (c) above, if not paid earlier, is due and payable on February 28, 2093. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in BARNSTABLE County, Massachusetts, which has the address of:

122 Oakmont Road, YARMOUTH PORT, MA 02675, and is described more fully on Exhibit A attached to and hereby incorporated into this Mortgage ("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

*Massachusetts 1st Security Instrument (Fixed)*
*Page 1*                                                    © Bay Docs, Inc. 06/10




BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal and Interest.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note.

2.   **Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

3.   **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender, instead of to Borrower and Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

4.   **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower (or at least one Borrower, if initially more than one person are Borrowers) shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument. "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited

 

to, representations concerning Borrower's occupancy of the Property as a principal residence.  If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**5.  Charges to Borrower and Protection of Lender's Rights in the Property.**  Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2.  Borrower shall pay these obligations on time directly to the entity which is owed the payment.  If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.  Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium ("MIP") as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities ("Servicing Fee") as defined in the Loan Agreement.  Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6.  Inspection.**  Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property.  If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

**7.  Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation, or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender.  The proceeds shall be applied first to the reduction of any indebtedness under the Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument.  Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**8.  Fees.**  Lender may collect fees and charges authorized by the Secretary.

**9.  Grounds for Acceleration of Debt.**
(a)  **Due and Payable.**  Lender may require immediate payment in full of all sums secured by this Security Instrument if:
    (i)  A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

    (ii)  All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains (a) title to the Property in fee simple, (b) a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower, or (c) a life estate in the Property (or retains a beneficial interest in a trust with such an interest in the Property).

© Bay Docs, Inc. 06/10

 

(b) **Due and Payable with Secretary Approval.** Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval by an authorized representative of the Secretary, if:

(i)  The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

(ii)  For a period of longer than twelve (12) consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

(iii)  An obligation of the Borrower under this Security Instrument is not performed.

(c) **Notice to Lender.** Borrower shall notify Lender whenever any of the events listed in Paragraph 9(a)(ii) and (b) occur.

(d) **Notice to Secretary and Borrower.** Lender shall notify the Secretary and Borrower whenever the loan becomes due and payable under Paragraph 9(a)(ii) and (b).  Lender shall not have the right to commence foreclosure until Borrower has had thirty (30) days after notice to either:

(i)  Correct the matter which resulted in the Security Instrument coming due and payable; or

(ii)  Pay the balance in full; or

(iii)  Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or

(iv)  Provide the Lender with a deed in lieu of foreclosure.

(e) **Trusts.** Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph 9.  A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

**10.  No Deficiency Judgments.** Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed.  If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

**11.  Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full. This right applies even after foreclosure proceedings are instituted.  To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment in full. Foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with a foreclosure proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full.  However, Lender is not required to permit reinstatement if:(i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two (2) years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

© *Bay Docs, Inc. 06/10*




**12. First Lien Status.**

(a) Modification. Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the Property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the priority of the lien status of future loan advances. Borrower agrees to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

(b) Tax Deferral Programs. Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

(c) Prior Liens. Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within ten (10) days of the giving of notice.

**13. Relationship to Second Security Instrument.**

(a) Second Security Instrument. In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to execute a Second Note and a Second Security Instrument on the Property.

(b) Relationship of First and Second Security Instruments. Payments made by the Secretary shall not be included in the debt under the Note unless:

    (i) This Security Instrument is assigned to the Secretary; or

    (ii) The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments, but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

(c) Effect on Borrower. Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

    (i) Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note; or

 

(ii) Be obligated to pay interest or shared appreciation under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

(d) No Duty of the Secretary. The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

14. Forbearance by Lender Not a Waiver. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of, or preclude the exercise of, any right or remedy.

15. Successors and Assigns Bound; Joint and Several Liability. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender. Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

16. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

17. Governing Law; Severability. This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

18. Borrower's Copy. Borrower shall be given one conformed copy of the Note and this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

19. Assignment of Rents. Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach.




Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

**20. Foreclosure Procedure.** If Lender requires immediate payment in full under Paragraph 9, Lender may invoke the STATUTORY POWER OF SALE and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 20, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by applicable law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instru mentand (c) any excess to the person or persons legally entitled to it.

**21. Lien Priority.** The full amount secured by this Security Instrument shall have the same priority over any other liens on the Property as if the full amount had been disbursed on the date the initial disbursement was made, regardless of the actual date of any disbursement. The amount secured by this Security Instrument shall include all direct payments by Lender to Borrower and all other loan advances permitted by this Security Instrument for any purpose. This lien priority shall apply notwithstanding any State constitution, law or regulation, except that this lien priority shall not affect the priority of any liens for unpaid State or local governmental unit special assessments or taxes.

**22. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**23. Obligatory Loan Advances.** Lender's responsibility to make Loan Advances under the terms of the Loan Agreement, including Loan Advances of principal to Borrower as well as Loan Advances for interest, MIP, Servicing Fees, and other charges shall be obligatory.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

**25. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

**26. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check all riders that are applicable.]

| Condominium Rider | FUD Rider |
| --- | --- |
| Shared Appreciation Rider | Other |

*Massachusetts 1st Security Instrument (Fixed)*
*Page 7*

© *Bay Docs, Inc. 06/10*

 

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____

AURELIUS V SKAPARS (BORROWER)

AURELIUS V SKAPARS, TRUSTEE          YVONNE V SKAPARS, TRUSTEE

### Notary Acknowledgement

State of Massachusetts
County of BARNSTABLE

On this 2-1 day of OCTOBER , 20 11 before me personally appeared

Aurelius V Skapars and Yvonne V Skapars

to me known and known to me to be the individual(s) described in and who executed the foregoing instrument, and duly acknowledged to me that he/she/they executed the same.

_____          [SEAL]
Notary Public

KEITH A. McMANUS, ESQ.
Notary Public
Commonwealth of Massachusetts
My Commission Expires February 16, 2018

My commission expires:

========================STATE OF MASSACHUSETTS
Title No.

Aurelius V, Skapars, Trustee and Yvonne V, Skapars, Trustee of the Skapars Nominee Trust

-TO-

MetLife Home Loans, a Division of MetLife Bank, N.A.

Record and Return to:
MetLife Home Loans, a Division of MetLife Bank, N.A.
P.O. Box 8157
Edmond, OK 73083-8157

Receipt of a true copy of this instrument provided without charge, is hereby acknowledged.

Witness:

Aurelius V Skapars  (Borrower)

*Massachusetts 1st Security Instrument (Fixed)*
*Page 8*

© Bay Docs, Inc. 06/10



## EXHIBIT A

Exhibit A to the Mortgage given on October 21, 2011, by Aurelius V. Skapars, Trustee and Yvonne V. Skapars, Trustee of the Skapars Nominee Trust ("Borrower") to MetLife Home Loans, a Division of MetLife Bank, N.A. ("Lender"). The Property is located in the county of BARNSTABLE, state of MA, described as follows:

Description of Property

See Schedule A attached

*Massachusetts 1st Security Instrument (Fixed)*
*Page 9*

© *Bay Docs, Inc. 06/10*



### TRUSTEES' CERTIFICATE

We, Aurelius V. Skapars, Trustee, and Yvonne V. Skapars, Trustee, both Trustees of the Skapars Nominee Trust, a revocable trust u/d/t May 23, 2002, having a mailing address of 122 Oakmont Road, Yarmouth Port, Massachusetts 02675, evidenced by a Certificate of Trust recorded in Book 15216, Page 279, with the Barnstable County Registry of Deeds, under oath do depose and say as follows:

1. That We are the current and sole trustees of the Skapars Nominee Trust, under declaration of trust dated May 23, 2002.
2. That said Trust has not been revoked or amended and that the same is still in full force and effect.
3. That We have been duly authorized and directed by all of the beneficiaries of said Trust to sign, seal, acknowledge, and deliver the attached and foregoing mortgage in the amount of $712,500.00 [Seven hundred twelve thousand five hundred dollars and no cents], to MetLife Home Loans, a Division of MetLife Bank, N.A., ISAOA/ATIMA on the terms and conditions named therein.
4. That all of the beneficiaries of said trust are competent and of full age and are operating under no constraint or undue influence.

 

SUBSCRIBED AND SWORN to under the pains and penalties of

perjury this 21ˢᵗ day of October, 2011.



Aurelius V. Skapars                          Yvonne V. Skapars
Trustee                                      Trustee

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, SS,                          OCTOBER 21, 2011

On this 21ˢᵗ day of October, 2011, before me, the
undersigned notary public, personally appeared Aurelius V.
Skapars, Trustee and Yvonne V. Skapars, Trustee of the Skapars
Nominee Trust, proved to me through satisfactory evidence of
identification, which was a driver's license, to be the person
whose name is signed on the preceding or attached document, and
acknowledged to me that they signed it voluntarily for its stated
purpose.

KEITH A. McMANUS, ESQ.
Notary Public
Commonwealth of Massachusetts
My Commission Expires February 18, 2016

Notary Public
My commission expires:



Exhibit A

Property Address: 122 Oakmont Road, Yarmouth Port, MA 02675

the land with the buildings thereon, situated in (Cummaquid) Barnstable, Barnstable County, Massachusetts, described as follows:

Being Lot 203 on plan of land entitled "Subdivision Plan of Land in Cummaquid, Barnstable, Massachusetts for Cummaquid Realty Trust Scale 1" = 100', January 1970, Barnstable Survey Consultants, Inc., 608 Main Street, West Yarmouth, Mass.," said plan duly recorded in Barnstable Registry of Deeds in Plan Book 235, 149.

No portion of the fee in ways shown on said plan is conveyed herein.

Said premises are subject to the reservations set forth in a deed from Filmore W. McAbee and James A. Robertson, Trustee of Cummaquid Realty Trust dated November 20, 1981, recorded in Barnstable County Registry of Deeds, Book 3402, Page 11.

Said premises are conveyed subject to and together with the benefit of all rights, easements, reservations and restrictions of record insofar as the same are now in force and effect and specifcally said premises are subject to the restrictions entitled "Cummaquid Heights Restrictions" recorded in Barnstable County Registry of Deeds, Book 3402, Page 12.

For my title, see Book 22857, Page 325



Bk 27135 P=225 #10102
02-15-2013 8 01:56p

**MASSACHUSETTS**

COUNTY OF *BARNSTABLE (REC)*
LOAN NO

PREPARED BY:
SECURITY CONNECTIONS, INC.
WHEN RECORDED MAIL TO:
*SECURITY CONNECTIONS, INC*
*240 TECHNOLOGY DRIVE*
*IDAHO FALLS, ID 83401*
*PH: (208)528-9895*
*ATTN: TERRILL NIELSON*

# ASSIGNMENT OF REAL ESTATE MORTGAGE

For value received, *METLIFE HOME LOANS, A DIVISION OF METLIFE BANK, N.A.,* located at *1555 W WALNUT HILL LANE #200, IRVING, TX 75038,* hereby acknowledged, does hereby sell, assign, transfer, set over, grant, and convey without representation, recourse or warranty, express or implied by and between assignor and *NATIONSTAR MORTGAGE LLC,* located at *350 HIGHLAND DRIVE, LEWISVILLE, TX 75067,* its successors and assigns forever, that certain mortgage executed by *AURELIUS V. SKAPARS, TRUSTEE AND YVONNE V. SKAPARS, TRUSTEE OF THE SKAPARS NOMINEE TRUST* to *METLIFE HOME LOANS, A DIVISION OF METLIFE BANK, N.A.,* dated *10/21/2011,* and recorded on *10/27/2011,* in the Land Registration and Registry of Deeds for *BARNSTABLE (REC)* County, Massachusetts, in Mortgage Book *25787,* Page *91,* and Instrument No. *53720.*

*Property Address: 122 OAKMONT ROAD YARMOUTH PORT, MA 02675*

 

LOAN NO �ču▐▐▐▐▐

TOGETHER with all rights accrued or to accrue under said Mortgage.

Dated    **JAN 1 6 2013**

In Witness Whereof, *METLIFE HOME LOANS, A DIVISION OF METLIFE*

*BANK, N.A.*, caused these presents to be signed by

__Berlinda Smith Dorsey__    it's *LIMITED VICE PRESIDENT* and

__Janice Robertson__    it's *LIMITED VICE PRESIDENT*.

This Date    **JAN 1 6 2013**

METLIFE HOME LOANS, A DIVISION OF METLIFE BANK, N.A.

Name: Kendria Morris
Witness

BY _____
Name:    **Berlinda Smith Dorsey**
Title: *LIMITED VICE PRESIDENT*

Name:    Craig Hicks
Witness

BY _____
Name:    Janice Robertson
Title: *LIMITED VICE PRESIDENT*

STATE OF *TEXAS*         )
                         ) ss
COUNTY OF *DALLAS*       )

On    **JAN 1 6 2013**    , before me,    **Cherelle Twehgbe Berry**    personally

appeared    __Berlinda Smith Dorsey__    , and    __Janice Robertson__    ,

personally   known   to   me   (or   proved   to   me   on   the   basis   of

satisfactory evidence) to be the person(s) who executed the within

instrument as *LIMITED VICE PRESIDENT* and *LIMITED VICE PRESIDENT* on

behalf of the corporation therein named and acknowledged to me that

the corporation executed it.

_____
Cherelle Twehgbe Berry

NOTARY PUBLIC

CHERELLE TWEHGBE BERRY
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES
09-20-2016

ML▐▐▐▐▐▐▐           Page 2 of 2

BARNSTABLE REGISTRY OF DEEDS

 

# HOME EQUITY CONVERSION LOAN AGREEMENT
## CLOSED END

FHA Case Number: 
Loan Number:

THIS AGREEMENT is made on October 21, 2011 among Aurelius V Skapars ("Borrower") and MetLife Home Loans, a Division of MetLife Bank, N.A. ("Lender") and the Secretary of Housing and Urban Development ("Secretary").

### Article 1 – Definitions

**1.1. Expected Average Mortgage Interest Rate** means the amount indicated on the attached payment plan (Exhibit 1). It is a constant interest rate used to calculate monthly payments to the Borrower throughout the life of the loan.

**1.2. Loan Advances** means all funds advanced from or charged to Borrower's account under conditions set forth in this Loan Agreement, whether or not actually paid to Borrower. To the extent Borrower prepays any outstanding balance under the Note, such amounts will no longer be available to be advanced under this Loan Agreement.

**1.3. Loan Documents** means the Note, Second Note, Security Instrument and Second Security Instrument.

**1.4. Maximum Claim Amount** means the lesser of the appraised value of the Property as determined by the appraisal used in underwriting the loan, or the sales price of the property being purchased for the sole purpose of being the principal residence, or the national mortgage limit for a one family residence under section 305(a)(2) of the Federal Home Loan Mortgage Corporation Act (as adjusted where applicable under section 214 of the National Housing Act) as of the date of loan closing. Closing costs must not be taken into account in determining appraised value.

**1.5. Note** means the promissory note signed by Borrower together with this Loan Agreement and given to Lender to evidence Borrower's promise to repay, with interest, Loan Advances by Lender or Lender's assignees.

**1.6. Principal or Principal Balance** means the sum of all Loan Advances made as of a particular date, including interest and mortgage insurance premiums.

**1.7 Principal Limit** means the amount indicated on the attached payment plan (Exhibit 1) when this Loan Agreement is executed, and increases each month for the life of the loan at a rate equal to the sum of the applicable monthly interest rate charge, plus one-twelfth the annual MIP. The Principal Limit is calculated by multiplying the Maximum Claim Amount by a factor supplied by the Secretary, which is based on the age of the youngest Borrower and the Expected Average Mortgage Interest Rate.

**1.8. Principal Residence** means the dwelling where the Borrower shall maintain his or her permanent place of abode, and typically spends the majority of the calendar year. A person may have only one principal residence at any one time. The Property shall be considered to be the Principal Residence of any Borrower who is temporarily or permanently in a health care institution as long as the Property is the Principal Residence of at least one other Borrower who is not in a health care institution.

**1.9. Property** means Borrower's property identified in the Security Instrument.

**1.10. Second Note** means the promissory note signed by Borrower together with this Loan Agreement and given to the Secretary to evidence Borrower's promise to repay, with interest, Loan Advances by the Secretary secured by the Second Security Instrument.

**1.11. Second Security Instrument** means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Second Note.

**1.12. Security Instrument** means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Note.

### Article 2 – Loan Advances

 

 

**2.1. General.** Lender agrees to make Loan Advances under the conditions set forth in this Loan Agreement in consideration of the Note and Security Instrument given by Borrower on the same date as this Loan Agreement.

**2.2. Initial Advances.**

**2.2.1.** Loan Advances shall be used by Lender to pay, or reimburse Borrower for, closing costs listed in the Schedule of Closing Costs (Exhibit 2) attached to and made a part of this Loan Agreement, except that Loan Advances will only be used to pay origination fees in an amount not to exceed the greater of $2,500.00 or 2% of the maximum claim amount of the mortgage, up to a maximum claim amount of $200,000, plus 1% of any portion of the maximum claim amount that is greater than $200,000 nor shall the Lender charge the Borrower an origination fee in excess of $6,000.00.

**2.2.2.** Loan Advances shall be used by Lender to discharge the liens on the Property listed in the Schedule of Liens/HECM for Purchase Disbursements to Seller (Exhibit 2) attached to and made a part of this Loan Agreement.

**2.2.3.** Lender shall pay an initial Loan Advance to Borrower in the amount indicated on the attached payment plan (Exhibit 1).

**2.2.4.** Initial advances required by this Section 2.2 shall be made as soon as such advances are permitted by the applicable provisions of 12 CFR Part 226 (Truth in Lending) governing Borrower's right of rescission, but not before that time.

**2.3. Set Asides.**

**2.3.1.** Amounts set aside from the Principal Limit shall be considered Loan Advances to the extent actually disbursed or earned by Lender.

**2.3.2.** Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) for repairs to be made in accordance with a Repair Rider attached to and made a part of this Loan Agreement (Exhibit 3).

**2.3.3.** Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payments due for first year property charges consisting of taxes, hazard insurance, ground rents and assessments.

**2.3.4.** Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payment due for a fixed monthly charge for servicing activities of Lender or its servicer. Such servicing activities are necessary to protect Lender's interest in the Property. A servicing fee set aside, if any, is not available to the Borrower for any purpose, except to pay for loan servicing.

**2.4. Charges and Fees.** Borrower shall pay to Lender reasonable and customary charges and fees as permitted under 24 CFR 206.207(a). Such amounts shall be considered Loan Advances when actually disbursed by Lender.

**2.5. Monthly Payments.**

**2.5.1.** Borrower may request Loan Advances as Monthly Payments wherein Loan Advances shall be paid directly to Borrower in equal monthly payments.

**2.5.2.** Monthly payments shall be calculated for either the term payment plan or the tenure payment plan, as requested by Borrower.

**2.5.3.** Monthly payments under the term payment plan are made only during a term chosen by Borrower and shall be calculated so that the sum of (i) or (ii) added to (iii), (iv), (v) and (vi) shall be equal to or less than the Principal Limit at the end of the term:

**(i)** Initial Advances under Section 2.2., plus any initial servicing fee set aside under Subsection 2.3.4., or

**(ii)** The Principal Balance at the time of a change in payments under Sections 2.8. and 2.9. plus any remaining servicing fee set aside under Subsection 2.3.4., and

**(iii)** The portion of the Principal Limit set aside as a line of credit under Section 2.7., including any set asides for repairs (Subsection 2.3.2.) and first year property charges (Subsection 2.3.3.), and

 

(iv) All monthly payments due through the payment term, including funds withheld for payment of property charges under Section 2.10., and

(v) All mortgage insurance premiums, or monthly charges due to the Secretary in lieu of mortgage insurance premiums, which are due through the payment term (Subsection 2.13.), and

(vi) All interest through the payment term. The Expected Average Mortgage Interest Rate shall be used for this purpose.

2.5.4. Monthly payments under the tenure payment plan shall be calculated as in Subsection 2.5.3. as if there were a payment term with the number of months in the term equal to the sum of 100 minus the age of the youngest Borrower multiplied by 12, but payments shall continue until the loan becomes due and payable as provided in the Loan Documents.

2.5.5. Monthly payments shall be paid to Borrower on the first business day of a month.

2.5.6. If Borrower has requested monthly payments, payments shall be indicated on the attached payment plan (Exhibit 1). The payment plan may be changed by Borrower as provided in Sections 2.8. and 2.9.

### 2.6. Line of Credit without Monthly Payments.

2.6.1. Borrower may request (i) a single Loan Advance under a line of credit payment plan to be paid in a lump sum disbursement upon settlement of the loan or (ii) Loan Advances under a line of credit payment plan in amounts and at times determined by Borrower, if the Principal Balance of the loan after the Loan Advance is made is less than or equal to the applicable Principal Limit, excluding any portion of the Principal Limit set aside under Sections 2.3.2. or 2.3.4. The line of credit amount increases at the same rate as the total Principal Limit under Section 1.7.

2.6.2. Line of credit payments shall be paid to Borrower within five (5) business days after Lender has received a written request for payment by Borrower.

2.6.3. Lender may specify a form for line of credit payment requests.

2.6.4. Lender shall provide Borrower with a statement of the account every time a line of credit payment is made. The statement shall include the current interest rate, the previous Principal Balance, the amount of the current Loan Advance, the current Principal Balance after the Loan Advance, and the current Principal Limit.

### 2.7. Line of Credit with Monthly Payments.

2.7.1. Borrower may receive monthly payments under either a term or tenure payment plan combined with a line of credit, as indicated on the attached payment plan (Exhibit 1).

2.7.2. Subsections 2.6.2., 2.6.3. and 2.6.4. apply to a line of credit combined with term or tenure payments.

2.7.3. If Borrower combines a line of credit with a term or tenure payment plan, the Principal Limit is divided into: (a) an amount for the line of credit payments, including repair and property charge set asides, (b) an amount for monthly payments which shall be calculated under Subsection 2.5.3. or 2.5.4. and (c) an amount for a servicing fee set aside, if required by Lender under Subsection 2.3.4. Amounts designated for line of credit payments and monthly payments increase independently at the same rate as the total Principal Limit increases under Section 1.7. Borrower can request Loan Advances in amounts and at times determined by Borrower, if the requested amount is less than or equal to the difference between (a) the Principal Limit applicable to the line of credit set aside and (b) the portion of the outstanding Principal Balance attributable to draws on the line of credit, including accrued interest and mortgage insurance premium or monthly charge due to the Secretary, but excluding any portion of the Principal Limit set aside under Subsections 2.3.2. and 2.3.4.

2.7.4. A Borrower receiving monthly payments in combination with a line of credit may prepay the outstanding mortgage balance in accordance with the terms of the Note.

### 2.8. Change in Payments Generally.

 

**2.8.1.** Whenever the Principal Balance of the loan is less than the Principal Limit, Borrower may change from any payment plan allowable under this Loan Agreement to another.

**2.8.2.** If Borrower requests that monthly payments be made after a change in payment plan, Lender shall recalculate future monthly payments in accordance with Subsections 2.5.3. or 2.5.4.

**2.8.3.** Lender may charge a fee not to exceed twenty (20) dollars, whenever payments are recalculated and in any other circumstances in which Borrower is required to sign a form acknowledging a change in payment plan as provided in Subsection 2.8.5.

**2.8.4.** Loan Advances under a new payment plan shall be paid to Borrower in the same manner and within the time period required under Sections 2.5., 2.6. or 2.7.

**2.8.5.** Changes in the payment plan must be acknowledged by Borrower by signing a form containing the same information as the attached payment plan (Exhibit 1). Lender shall provide a copy of the completed form to Borrower.

### 2.9. Change in Payments Due to Initial Repairs.

**2.9.1.** If initial repairs after closing, made in accordance with the Repair Rider, are completed without using all of the repair set aside, Lender shall inform Borrower of the completion and the amount then available to the Borrower to be drawn under a line of credit.

**2.9.2.** If initial repairs after closing, made in accordance with the Repair Rider, cannot be fully funded from the repair set aside, any additional Loan Advances needed to complete repairs shall be made in the manner provided under Section 2.16.

**2.9.3.** If initial repairs are not completed when required by the Repair Rider, Borrower shall not request and Lender shall not make any further payments, except as needed to pay for repairs required by the Repair Rider and mandatory Loan Advances under Section 4.5. In order to complete the required repairs, Loan Advances shall be made first from the repair set aside, and then in the manner provided under Section 2.16.

### 2.10. Payment of Property Charges.

**2.10.1.** Borrower may elect to require Lender to use Loan Advances to pay property charges consisting of taxes, hazard insurance premiums, ground rents and special assessments if indicated on the attached payment plan (Exhibit 1). If Borrower has elected to have Lender pay property charges, Borrower may change this election by notifying Lender and at that time Lender shall pay to Borrower any amounts withheld from the Loan Advances to pay property charges.

**2.10.2.** If Borrower has made the election under Subsection 2.10.1. and Borrower is receiving monthly payments, Lender shall withhold amounts from each monthly payment and use the amounts withheld to make timely payments of property charges. The amounts withheld shall be calculated as provided in Subsection 2.10.3. Amounts withheld from monthly payments shall not be treated as Loan Advances and shall not bear interest except to the extent actually disbursed by Lender.

**2.10.3.** Lender shall withhold from each monthly payment an amount to pay (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for fire, flood and other hazard insurance required by the Security Instrument. Each monthly withholding for items (a), (b) and (c) shall equal one-twelfth of the annual amounts, as reasonably estimated by Lender. The full annual amount for each item shall be paid by Lender before an item would become delinquent. Lender shall add the amounts for items (a), (b) and (c) to the Principal Balance when paid. If at any time the withholding for item (a), (b), or (c) exceeds the amount of actual property charges, Lender shall pay the excess withholding to Borrower and add it to the Principal Balance. If the total of the withholding for item (a), (b), or (c) is insufficient to pay the item when due, the amount necessary to make up the deficiency on or before the date the item becomes due shall be paid as a Loan Advance in the manner provided under Section 2.16.

**2.10.4.** If Borrower has made the election under Subsection 2.10.1. and Borrower is not receiving monthly payments, Lender shall make Loan Advances under the line of credit payment plan as needed to make timely payments of property charges, provided that no such Loan Advance shall exceed the amount permitted by Section 2.6.1.

 

**2.10.5.** If Borrower fails to pay the property charges in a timely manner, and has not elected to have Lender make the payments, Lender shall pay the property charges as a Loan Advance as required under Section 2.16. If a pattern of missed payments occurs, Lender may establish procedures to pay the property charges from Borrower's funds as if Borrower elected to have Lender pay the property charges.

**2.10.6.** Lender shall immediately notify any Borrower who has made the election under Subsection 2.10.1. whenever Lender determines that amounts available from monthly payments or line of credit payments will be insufficient to pay property charges.

**2.11. Insurance and Condemnation Proceeds.** If Insurance or condemnation proceeds are paid to Lender, the Principal Balance shall be reduced by the amount of the proceeds not applied to restoration or repair of the damaged Property and the available loan funds shall be recalculated. At the same time, the Principal Limit also shall be reduced by the amount of the proceeds applied to reduce the Principal Balance.

**2.12. Interest.**

**2.12.1.** Interest shall be calculated as provided in the Loan Documents.

**2.12.2.** Interest shall accrue daily and be added to the Principal Balance as a Loan Advance at the end of each month.

**2.13. Mortgage Insurance Premium (MIP); Monthly Charge.**

**2.13.1.** Monthly MIP shall be calculated as provided in 24 CFR Part 206. If the Security Instrument is held by the Secretary or if the Secretary makes Loan Advances secured by the Second Security Instrument, a monthly charge shall be due to the Secretary and shall be calculated in the same manner as MIP.

**2.13.2.** The full amount of monthly MIP or monthly charge, including any portion of the MIP retained by a Lender under 24 CFR 206.109, shall be considered to be a Loan Advance to Borrower on the later of the first day of the month or the day Lender pays the MIP to the Secretary, if any MIP is due to the Secretary. In the event that the Note becomes due and payable or the Note is prepaid in full after the first day of the month, Lender may add the accrued MIP to the Principal Balance or the Secretary may add the accrued monthly charge to the Principal Balance.

**2.14. Manner of Payment.** For purposes of this Section "Borrower" shall not include any person who signed this Loan Agreement but who has a Principal Residence different from the Property. Only a Borrower has a right to receive Loan Advances. Borrowers shall choose to receive Loan Advances by either electronic funds transfer to a bank account designated by all Borrowers or by check mailed to an address designated by all Borrowers, except where all Borrowers agree that payment should be made directly to a third party for the benefit of the Borrowers. Borrowers may change the manner of payment by notifying Lender.

**2.15. Protection of Property.**

**2.15.1.** If Borrower vacates or abandons the Property, or if Borrower is in default under the Security Instrument, then Lender may make reasonable expenditures to protect and preserve the Property and these expenditures will be considered Loan Advances as required under Section 2.16.

**2.15.2.** If Borrower fails to pay any governmental or municipal charges, fines or impositions that are not included in Section 2.10. or if there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property. These expenditures will be considered Loan Advances as required under Section 2.16.

**2.16. Unscheduled Payments.** Loan Advances made pursuant to Sections 2.4., 2.9.2., 2.9.3., 2.10.3., 2.10.5., and 2.15. shall be made from a line of credit under Section 2.6. or 2.7. to the extent possible. If no line of credit sufficient to make the Loan Advances exists, any future monthly payments must be recalculated in accordance with Subsection 2.5.3. or 2.5.4. to create a line of credit sufficient to make the Loan Advances.

 

### Article 3 – Late Charge

**3.1. Amount Due.** Lender shall pay a late charge to Borrower for any late payment. If Lender does not mail or electronically transfer a scheduled monthly payment to Borrower on the first business day of the month or mail or electronically transfer a line of credit payment to Borrower within 5 business days of the date Lender received the request, the late charge shall be 10 percent of the entire amount that should have been paid to the Borrower for that month or as a result of that request. For each additional day that Lender fails to make payment, Lender shall pay interest on the late payment at the interest rate stated in the Loan Documents. If the Loan Documents provide for an adjustable interest rate, the rate in effect when the late charge first accrues shall be used. In no event shall the total late charge and interest exceed five hundred dollars. Any late charge shall be paid from Lender's funds and shall not be added to the unpaid Principal Balance.

**3.2. Waiver.** The Secretary may waive a late charge where the Secretary determines that the late payment resulted from circumstances beyond Lender's control and that no act or omission of Lender contributed to the late payment. At the time Lender requests a waiver, Lender shall inform Borrower that a waiver of late charge has been requested from the Secretary and that the late charge will be sent to Borrower if the waiver is denied. If the Secretary denies the waiver, Lender shall pay to Borrower the late charge and interest that accrued from the date the payment was late until the date the waiver was requested.

### Article 4 – Termination of Lender's Obligation to Make Loan Advances

**4.1. Loan Due and Payable.** Lender shall have no obligation to make Loan Advances if Lender has notified Borrower that immediate payment-in-full to Lender is required under one or more of the Loan Documents unless and until the notice is rescinded by Lender.

**4.2. Loan Advances by Secretary.** If the Security Instrument has been assigned to the Secretary or the Secretary notifies Lender and Borrower that Loan Advances are secured by the Second Security Instrument, Lender shall have no further obligation to make Loan Advances under this Loan Agreement, unless the Secretary accepts later reimbursement by the Lender for all Loan Advances made, earned or disbursed by the Secretary. The Secretary may establish procedures for handling requests for payments and changes in payment plans during the interval between Lender's notification of intent to assign the Security Instrument to the Secretary and completion of the assignment. Borrower shall be informed of such procedures by Lender and/or the Secretary, and Borrower shall comply with such procedures.

**4.3. Lien Status Jeopardized.** Lender shall have no obligation to make further Loan Advances if the Lender or the Secretary determines that the lien status of the Security Instrument or the Second Security Instrument is jeopardized under State laws as described in Paragraph 12(a) of the Security Instrument or Second Security Instrument and the lien status is not extended in accordance with Paragraph 12(a).

**4.4. Bankruptcy.** Lender shall have no obligation to make further Loan Advances on or following the date that a petition for bankruptcy of Borrower is filed.

**4.5. Mandatory Loan Advances.** Notwithstanding anything in Sections 4.1. through 4.4., all Loan Advances under Sections 2.10 (property charges), 2.12. (interest), 2.13. (MIP or monthly charge), 2.15. (protection of Property) or 2.3.4. (servicing fee) shall be considered mandatory Loan Advances by Lender.

**4.6. Prepayment in Full.** Lender shall not make Loan Advances if Borrower has paid the Note in full (or the Second Note, if the Secretary has assumed the Lender's rights and obligations under Article 5).

### Article 5 – HUD Obligation

If the Lender has no further obligation to make payments to Borrower because of Section 4.2., the Secretary shall assume the rights and obligations of Lender under this Loan Agreement, except the Secretary shall not assume any obligation of paying flood, fire and other hazard insurance from Loan Advances. If the Secretary makes Loan Advances to Borrower under the Second Security Instrument, the portion of the Principal Limit available for Loan Advances shall be the difference between the current Principal Limit and the combined Principal Balances on the Security Instrument less accrued interest and the Second Security Instrument.

### Article 6 – Miscellaneous

**6.1. Forbearance Not a Waiver.** Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

 

**6.2. Successors and Assigns Bound; Joint and Several Liability; Cosigners.** The covenants and agreements of this Loan Agreement shall bind and benefit the successors and assigns of Lender. An assignment made in accordance with the regulations of the Secretary shall fully relieve the Lender of its obligations under this Loan Agreement. Borrower may not assign any rights or obligations under this Loan Agreement. Borrower's covenants and agreements shall be joint and several.

**6.3. Notices.** Any notice to Borrower provided for in this Loan Agreement shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the property address shown in the Security Instrument or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice to the Secretary shall be given by first class mail to the HUD National Servicing Center or any other place designated by the Secretary. Any notice provided for in this Loan Agreement shall be deemed to have been given to Borrower, Lender or the Secretary when given as provided in this Section.

**6.4. Governing Law; Severability.** This Loan Agreement shall be governed by Federal law and the law of the jurisdiction in which the Property is located. The Lender in this Loan Agreement must comply with the Fair Housing Act, 42 U.S.C. §§3601 – 3619, which prohibits discrimination on the basis of race, color, religion, sex, handicap familial status, or national origin. In the event that any provision or clause of this Loan Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Loan Agreement which can be given effect without the conflicting provision. To this end the provisions of this Loan Agreement are declared to be severable.

**6.5. Copies.** Lender, Borrower and the Secretary shall each receive one original executed copy of this Loan Agreement when signed by the Secretary.

**6.6. When Agreement Becomes Binding.** This Loan Agreement shall bind Lender and Borrower when both Lender and Borrower have signed. This Loan Agreement shall bind the Secretary only when the lender signs on behalf of the Secretary of Housing and Urban Development and a Mortgage Insurance Certificate is issued for the Security Instrument.

BY SIGNING BELOW the parties accept and agree to the terms contained in this Loan Agreement and the exhibits.

_____
Aurelius V Skapars (Borrower)

MetLife Home Loans, a Division of MetLife Bank, N.A.

_____    (SEAL)
By:
Title:   **Danielle Petilli**
         **Closer**

Secretary of Housing and Urban Development

By:_____    (SEAL)
Title




## EXHIBIT 1
## PAYMENT PLAN

Date of Payment Plan:  October 21, 2011
FHA Case Number: ▓▓▓▓▓▓▓▓▓▓▓▓
Loan Number: ▓▓▓▓▓▓▓
Name of Lender:      MetLife Home Loans, a Division of MetLife Bank, N.A.

Name of Borrower(s)                                                          **Birth Date**
    Aurelius V Skapars                                                    ▓▓▓▓▓▓▓▓▓▓▓▓

Select Payment Plan Type:  **Lump Sum Disbursement**
(Options: (1) Tenure (2) Term  (3) Line of Credit  (4) Modified Tenure  (5) Modified Term  (6) Lump Sum Disbursement)

| | | |
|---|---|---|
| Was the Expected Average Mortgage Interest Rate looked? | **NO** | |
| Date used to determine the Index to calculate the Expected Average Mortgage Interest Rate: | **10/13/2011** | |
| Provide the Expected Average Mortgage Interest Rate | **5.060**% | |
| Provide the Initial Mortgage Interest (accrual) Rate | **5.060**% | |
| Provide the Margin | **0.000**% | |

| # | | | |
|---|---|---|---|
| 1. | Principal Limit | $313,025.00 | |
| | Initial Payments (if completed at closing): | | |
| 2. | Closing Costs | $12,591.44 | |
| 3. | Discharge of Liens | $258,356.80 | |
| | Lender/Broker Credit | ($0.00) | |
| 4. | Outstanding Balance | . | |
| | (if completed after closing) | $0.00 | |
| 5. | Loan Advance | $40,576.76 | |
| 6. | Servicing Fee Set Aside | $0.00 | |
| 7. | Total Deductions from Principal Limit | | |
| | (Lines 2 + 3 + 4 + 5 + 6) | | $311,525.00 |
| 8. | Principal Limit for Line of Credit | $1,500.00 | |
| | Funds in Line of Credit Designated For: | | |
| 9. | Repairs | $1,500.00 | |
| 10. | Property Charges | $0.00 | |
| 11. | Outstanding Balance on Line of Credit | | |
| | from previous payments | $0.00 | |
| | Total Deductions from Principal Limit for | | |
| 12. | Line of Credit (Lines 9 + 10 + 11) | $1,500.00 | |
| 13. | Funds Available to Borrower in Line of Credit | | |
| | (Lines 8 - 12) | | $0.00 |
| 14. | Net Principal Limit (Lines 1 - 7 - 9 - 10) | | $0.00 |
| 15. | Net Principal Limit Available for Monthly Payments | | |
| | (Lines 14 - 13) | | $0.00 |
| | Scheduled Payments: | | |
| 16. | _ Term (Remaining)  n/a Years and n/a Months, | | |
| | or | | |
| 17. | _ Tenure     (Check only one plan) | | |
| 18. | Monthly Payment (Total) | $0.00 | |
| 19. | Monthly Withholding (T & I) | $0.00 | |
| 20. | Net Monthly Payment (Lines 18 - 19) | $0.00 | |

BY SIGNING BELOW, the borrower(s) agree(s) that this document accurately describes the principal features of the current payment plan chosen by the borrower(s).

*Aurelius V Skapars* (signature)                                              *Oct 21, '11*
Aurelius V Skapars (Borrower)                                                              Date

 

## EXHIBIT 2
## SCHEDULE OF LIENS/HECM for Purchase Disbursements to Seller

### SCHEDULE OF LIENS

| | |
|---|---|
| Rockland Trust | 224,187.74 |
| Rockland Trust | 33,127.43 |
| Taxes | 1,041.63 |

Note: Borrower bringing in funds to cover total payoffs in the amount of $0.00 (if applicable)

### SCHEDULE OF CLOSING COSTS

See Attached HUD-1
Page 2




## EXHIBIT 3
### REPAIR RIDER TO LOAN AGREEMENT

FHA Case Number: ██████████                    Loan Number: ██████████

THIS REPAIR RIDER is made on October 21, 2011, and is incorporated into and shall be deemed to supplement the Loan Agreement of the same date made by the undersigned Lender and the undersigned Borrower and the Secretary of Housing and Urban Development ("Secretary").

I. Lender's Promises

A. The Lender shall set aside $1,500.00 from the Initial Principal Limit under the Loan Agreement to be used for the purpose of bringing the Property up to the property standards required by the Secretary by repairing:

   Scrape and paint 1st floor and exterior of dwelling. $1,000

B. The Lender may charge a repair administration fee not to exceed the greater of fifty dollars ($50) or 1.5% of the amounts advanced by Lender under this Repair Rider. This fee shall be added to the Principal Balance as each Loan Advance is made.

C. The Lender shall require one or more inspections by a HUD-approved Inspector during the course of the repair work. The Lender shall not release any funds for work which is not complete and which is not approved by a HUD-approved inspector. The Lender certifies by executing this Repair Rider that the repairs which are funded under this Repair Rider will be completed in a manner to meet HUD property standards required by the Secretary as determined by a HUD-approved inspector.

D. The Lender shall ensure that all mechanic's liens and materialmen's liens are released of record prior to an advance of funds under this Repair Rider. The Lender may require the Borrower to obtain acknowledgment of payment and releases of lien from all contractors, subcontractors, and materialmen. Such acknowledgments and release shall be in the form required by local laws and shall cover all work done, labor performed and materials (including equipment and fixtures) furnished for the project.

E. Until a HUD-approved inspector finds that all repairs required by Section I.A. of this Repair Rider have been completed in a satisfactory manner, the Lender shall not release funds in excess of (i) the total value of work satisfactorily completed, and (ii) the value of materials or equipment delivered to, and suitably stored at, the site but not yet incorporated in the work, less (iii) ten percent holdback, less (iv) prior advances under this Repair Rider.

F. Lender shall release the funds to Borrower and the contractor(s) jointly when permitted by Section I.C. of this Repair Rider and shall add the cost of the repairs to the Principal Balance under the Loan Agreement.

II. Borrower's Promises

A. The Borrower will complete all repairs required by Section I.A. of this Repair Rider so that the Property meets the property standards required by the Secretary as determined by a HUD-approved inspector.

B. Borrower shall cause work to begin on October 21, 2011. Borrower shall have work completed by October 21, 2012. Work is to be performed with reasonable diligence. Should Borrower fail to comply with these terms, until all repair work is satisfactorily completed Borrower shall not request and Lender shall not make any further payments under the Loan Agreement except for payment of repairs required by Section I.A. of this Repair Rider and Loan Advances required under Section 4.5. of the Loan Agreement.

C. Borrower will cause all improvements to be made in a workmanlike manner and in accordance with all applicable statutes and regulations. All licenses, permits and privileges required by local governmental authorities to rehabilitate the Property will be obtained by the Borrower(s) or his/her contractor.

D. Borrower will furnish such records, contracts, bills and other documents relating to the Property and improvements as the Lender or the Secretary may require.

E. Without prior written consent of Lender, no materials, equipment, fixtures, or any part of improvements financed with this loan shall be purchased or installed subject to conditional sales contracts, security agreements, lease agreements or other arrangements whereby title is retained or the right is reserved or accrues to anyone to remove or repossess any item, or to consider it as personal property.

_Aurelius V Skenars_ (Borrower)

_Danielle Petilli_
MetLife Home Loans, a Division of MetLife Bank, N.A. (Lender)
By:
Title: Closer

We hereby certify this to be a true and correct copy of the original document.

By: _____

Secretary of Housing and Urban Development

By:
Title:

Repair Rider – Exhibit 3
Page 1

© Bay Docs, Inc. 07/10